2000 UT 94

Zianibeth SHATTUCK–OWEN,
Plaintiff and Appellant,

v.

SNOWBIRD CORPORATION,
Defendant and Appellee.

No. 981594.

Supreme Court of Utah.

Dec. 5, 2000.

Mary J. Woodhead, Salt Lake City, for plaintiff.

Mary Anne Q. Wood, Sheri A. Mower, Salt Lake City, for defendant.

DURRANT, Justice:

¶ 1 Zianibeth Shattuck–Owen sued her employer, Snowbird Corporation, for invasion of privacy and breach of contract. Snowbird moved for summary judgment on both claims, arguing that the claims were barred by the Workers' Compensation Act and that Shattuck–Owen could not prove all the elements of her claims. The trial court granted the motion. Shattuck–Owen appeals the trial court's decision. We affirm in part and reverse in part.

## BACKGROUND

¶ 2 Shattuck–Owen worked as a server in Snowbird's banquet department. On May 24, 1996, she was scheduled to work two consecutive shifts. After completing her first shift, she retired to a lounge area to rest. While there, an unidentified man sexually assaulted her. The assault was recorded by Snowbird surveillance cameras. After the assault, Shattuck–Owen immediately informed her supervisor, who in turn reported the incident to Snowbird management. Management notified the police, who began an investigation.

¶ 3 Snowbird admits showing the surveillance video to nine people in conjunction with the investigation: 1) Richard Caldwell, Investigative Coordinator for Snowbird's Department of Public Safety; 2) Randy Keisker, Assistant Director for Snowbird's Department of Public Safety; 3) Dan Green, Snowbird investigator; 4) Brian Florida, Snowbird's Executive Chef, who viewed the tape to rule out the possibility that the perpetrator was one of his employees; 5) Heather Blume, Snowbird's Food and Beverage Manager, who viewed the tape to rule out her employees; 6) Tom Maxfield, Snowbird's Bell Captain and Valet Supervisor, who viewed the tape to rule out his employees; 7) Janine Wyatt, Snowbird's Conference Service Manager, who probably viewed the tape to rule out her employees; 8) Terry Comstock, Sandy Police Department, who was investigating a rapist in Sandy, Utah;

and 9) Linda Ziprich, a victim of the Sandy rapist.

¶ 4 In addition to these nine people, Shattuck–Owen alleges that her supervisor, Brett Hanson, watched the video, as did two or three other "individuals who were walking in and out of the security office while the tape was showing."

¶ 5 In early June, Shattuck–Owen contacted Kerry Roberts, Snowbird's Human Resources Director. Roberts suggested that Shattuck–Owen contact Michelle Myers, a therapist who worked with Snowbird's Employee Assistance Program, to help Shattuck–Owen deal with the trauma caused by the assault. Shattuck–Owen expressed a preference to see a private therapist with whom she already had a comfortable relationship. According to Shattuck–Owen, Roberts told her to first see Michelle Myers, and if Myers felt Shattuck–Owen would be better served by seeing a private therapist, then Roberts "saw no reason why Snowbird would not be willing to help" or "support" her.

¶ 6 Shattuck–Owen did consult with Myers, who recommended that Shattuck–Owen work with her own therapist. Snowbird refused to pay for Shattuck–Owen's therapy. Shattuck–Owen never pursued Workers' Compensation benefits for any injuries stemming from the assault or for the costs of therapy.

¶ 7 In September 1997, Shattuck–Owen filed suit against Snowbird, claiming that it invaded her privacy by carelessly allowing numerous people to view the video of the sexual assault. Shattuck–Owen also claimed that Snowbird had contracted to pay her therapy bills and breached that contract. Snowbird moved for summary judgment, arguing that both claims were barred by the exclusive remedy provision of the Workers' Compensation Act. In addition, Snowbird argued that even if the claims were not barred, they failed as a matter of law. Specifically, Snowbird asserted that Shattuck–Owen could not prove all the elements of her invasion of privacy claim, and that she could not prove breach of contract because no valid contract existed. As to the validity of the alleged contract, Snowbird asserted that Roberts had no authority to enter into a contract for Snowbird, and that the conversation creating

the alleged contract lacked sufficiently definite terms.

¶ 8 Following oral argument, the trial court granted summary judgment to Snowbird. The trial court ruled that Shattuck–Owen's claims were barred by the Workers' Compensation Act and that even if they were not, they failed as a matter of law. The court determined that Shattuck–Owen could not prove a necessary element of her invasion of privacy claim. It also ruled that Roberts did not have authority to contract on behalf of Snowbird. The trial court did not rule on whether the conversation between Shattuck–Owen and Roberts contained sufficiently definite terms to constitute a contract. Shattuck–Owen appeals.

## STANDARD OF REVIEW

¶ 9 Summary judgment is warranted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R.Civ.P. 56(c). We review a grant of summary judgment for correctness, giving no deference to the trial court's legal determinations. *See Gerbich v. Numed Inc.*, 1999 UT 37, ¶ 10, 977 P.2d 1205; *Harline v. Barker*, 912 P.2d 433, 438 (Utah 1996). In determining whether summary judgment is appropriate, " 'we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party.' " *K & T, Inc. v. Koroulis*, 888 P.2d 623, 624 (Utah 1994) (quoting *Higgins v. Salt Lake County*, 855 P.2d 231, 233 (Utah 1993)).

## ANALYSIS

¶ 10 As noted above, the trial court held that Shattuck–Owen could not prove a necessary element of her invasion of privacy claim and that Kerry Roberts did not have the authority to contract on behalf of Snowbird. The trial court also held that both claims were barred by the exclusive remedy provision of the Worker's Compensation Act. We

first address the invasion of privacy claim, followed by the contract claim.

## I. INVASION OF PRIVACY

¶ 11 Shattuck–Owen alleges that Snowbird invaded her privacy by publicly disclosing embarrassing private facts. Specifically, she claims that Snowbird carelessly allowed numerous people to view the surveillance video of her sexual assault. This court has not previously addressed the standard to be applied to an invasion of privacy claim in this particular context. We adopt the standard set forth in *Stien v. Marriott Ownership Resorts, Inc.*, 944 P.2d 374, 380 (Utah Ct.App.1997). *Stien* described four distinct variations of invasion of privacy claims. We are here concerned with a claim relating to public disclosure of embarrassing private facts. To prevail on this claim, Shattuck–Owen must establish the following elements:

(1) the disclosure of the private facts must be a public disclosure and not a private one;

(2) the facts disclosed to the public must be private facts, and not public ones;

(3) the matter made public must be one that would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

*Id.* at 380 (quoting W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 117, at 856–57 (5th ed.1984) (footnote omitted)).[1] The trial court ruled as a matter of law that "Snowbird's actions in showing the videotape do not constitute a public disclosure." We affirm that ruling.

¶ 12 Public disclosure "means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge." Restatement (Second) of Torts § 652D cmt. a (1977); *see also Jones v. U.S. Child Support Recovery*, 961 F.Supp. 1518, 1520 (D.Utah 1997). Thus, communicating a private fact "to a small group of persons," for

---

1. *Stien* notes that the Restatement (Second) of Torts § 652D (1977) contains another element, *see Stien*, 944 P.2d at 380, requiring that the matter made public not be "of legitimate concern to the public." Restatement (Second) of Torts

§ 652D(b) (1977). In light of our holding, we need not decide whether to adopt this requirement as an element of the invasion of privacy tort we address today.

example, does not constitute public disclosure. Restatement (Second) of Torts § 652D cmt. a. Nonetheless, the size of the audience that receives the communication, though an important consideration, is not dispositive of the issue. "Rather, the facts and circumstances of a particular case must be taken into consideration in determining whether the disclosure was sufficiently public so as to support a claim for invasion of privacy." *Robert C. Ozer, P.C. v. Borquez*, 940 P.2d 371, 378 (Colo.1997); *see, e.g., Kinsey v. Macur*, 107 Cal.App.3d 265, 165 Cal.Rptr. 608, 611–12 (1980) (finding public disclosure where defendant maliciously sent letters to a geographically, socially, and professionally diverse group of roughly twenty people); Restatement (Second) of Torts § 652D cmt. a (stating that publications in newspapers or magazines, even of small circulation, qualify as public disclosure).

¶ 13 In the instant case, the undisputed evidence shows that ten identified people, all legitimately involved with the investigation into the sexual assault, saw the video. Shattuck–Owen alleges two or three other, as yet unidentified, individuals also saw the video playing in the security office the day of the assault. Even assuming that to be true, Snowbird's display of the video does not constitute public disclosure. Snowbird showed the video to a discrete number of persons for the legitimate purposes of a criminal investigation. That two or three other Snowbird employees may have seen the video does not necessarily render the disclosure "public." Indeed, Shattuck–Owen concedes that it was appropriate for a "few" members of Snowbird's management to watch the video, and she has offered no evidence specifically identifying anyone who saw the video who had no legitimate reason for viewing it. In short, she has wholly failed to proffer any pertinent facts as to why Snowbird's display of the video to only twelve to thirteen individuals should nevertheless be considered a public disclosure. Thus, the trial court correctly ruled that Shattuck–Owen's invasion of privacy claim fails as a matter of law.[2] Because we affirm the trial court on this ground, we do not address its holding that Shattuck–Owen's invasion of privacy claim was also barred by the exclusive remedy provision of the Workers' Compensation Act.

## II. BREACH OF CONTRACT

### A. *Kerry Roberts's Authority to Contract on Snowbird's Behalf*

¶ 14 Shattuck–Owen also claims that Roberts, Snowbird's Human Resources Director, contracted on behalf of Snowbird to pay the costs of her private therapy. In granting summary judgment on this claim, the trial court ruled as a matter of law that Kerry Roberts did not have the authority to contractually bind Snowbird. The trial court based its decision on a statement, signed by Shattuck–Owen, found in Snowbird's employee handbook. In pertinent part, the statement reads as follows:

> I am aware that the policies, practices and procedures of Snowbird are not necessarily permanent and are subject to being modified, withdrawn or added to at any time. Although Snowbird hopes that relationships with team members will be long term and mutually rewarding, employment at Snowbird is "at will" which means that both the team member and Snowbird have

---

2. Likewise, we find no merit to Shattuck–Owen's additional invasion of privacy claim wherein Shattuck–Owen baldly asserts that Snowbird unreasonably intruded on her privacy by demanding that she visit Michelle Myers. As the only legal support for her claim she quotes the following from *Prosser and Keeton on Torts:* "[H]ighly personal questions or demands by a person in authority may be regarded as an intrusion on psychological solitude or integrity and hence an invasion of privacy." W. Page Keeton et al., *supra*, at 121 (Supp.1988). Regardless of whether this excerpt correctly states Utah law, we will not consider Shattuck–Owen's claim because she makes no attempt to explain how the legal principle she cites applies to the facts of the instant case. She simply asserts that Snowbird demanded that she visit Myers. No effort is made to explain how Snowbird's request could be considered "highly personal" or, more problematic still, how it could be considered an intrusive "demand" and also be part of the "offer" in the alleged contract underlying the breach of contract claim. In failing to set forth any analysis, Shattuck–Owen falls short of the reasoned argument required on appeal. *See State v. Thomas*, 961 P.2d 299, 305 (Utah 1998); *see also* Utah R.App.P. 24(a)(9). Thus, we will not consider this claim.

the right to terminate the employment relationship at any time and for any or no cause. Those rights cannot be waived or modified except in a signed, written contract between the team member and the CEO/Chairman who has the sole authority to enter into a written employment contract.

¶ 15 We hold that the trial court erred in ruling that this statement precluded Roberts from contracting on Snowbird's behalf with Shattuck–Owen to pay her therapy bills. On its face, the statement simply provides that the CEO/Chairman is the only person who can modify the at-will employment status of the signee, and that the modification must be in writing. In the instant case, Shattuck–Owen's alleged contract does not deal with her at-will employment status. As such, the signed statement appears to have no application to the instant case, at least in light of the facts currently on the record.

¶ 16 Moreover, the alleged facts, viewed in the light most favorable to Shattuck–Owen suggest Roberts possessed authority to contract for Snowbird. Foremost, Roberts was Snowbird's Human Resources Director—the person presumptively in charge of explaining and, when necessary, arranging for employee benefits. In addition, Snowbird management permitted Roberts to act as the company representative in attempting to address Shattuck–Owen's therapy needs. At the very least, these facts raise a genuine question as to Roberts's implied and/or apparent authority to act for Snowbird with respect to an employee benefits issue. *See, e.g., Zions First Nat'l Bank v. Clark Clinic Corp.,* 762 P.2d 1090, 1094–95 (Utah 1988) (discussing implied and apparent authority). Because issues of material fact remain regarding Roberts' authority to contract on Snowbird's behalf, the trial court erred in granting summary judgment on that ground. We therefore turn to the court's ruling that the Workers' Compensation Act's exclusive remedy provision bars any contractual obligation Snowbird allegedly undertook.

*B. Exclusive Remedy Provision of the Workers' Compensation Act*

¶ 17 The Workers' Compensation Act (the Act) provides as follows:

The right to recover compensation pursuant to this chapter ... shall be the exclusive remedy against the employer ... and the liabilities of the employer imposed by this chapter shall be in place of any and all other civil liability whatsoever ... on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment.

Utah Code Ann. § 34A–2–105(1) (1997). The trial court held that this provision bars Shattuck–Owen's breach of contract claim.

¶ 18 Snowbird argues on appeal that the trial court correctly barred Shattuck–Owen's claim because the therapy costs she incurred, and for which she now seeks recovery, were necessitated by an on-the-job sexual assault that is compensable under the Act. Snowbird asserts that Shattuck–Owen is merely attempting to "plead around the workers' compensation exclusivity provision" by characterizing her claim as one for breach of contract. We hold that Snowbird's argument on this issue is unavailing because Snowbird failed to establish that the exclusive remedy provision necessarily precluded Shattuck–Owen's contract claim.

¶ 19 The workers' compensation system constitutes a quid pro quo between employers and employees. *See Hunsaker v. State,* 870 P.2d 893, 899 (Utah 1993). Under the Act's balancing of rights, "employees are able to recover for job-related injuries without showing fault ... and employers are protected from tort suits by employees," *id.,* by virtue of the Act's exclusive remedy provision. Lest this careful balance of rights should tip too heavily in the employer's favor, the exclusive remedy provision must not be applied outside the coverage formula of the Act. It is well settled that the Act covers only mental and physical injuries sustained on the job. *See Mounteer v. Utah Power & Light Co.,* 823 P.2d 1055, 1057 (Utah 1991); *see also Retherford v. AT & T Communications,* 844 P.2d 949, 965 (Utah 1992). Accordingly, we have held that the exclusive remedy provision bars common-law tort actions requir-

ing proof of physical or mental injury. *See Mounteer*, 823 P.2d at 1056–58 (barring a claim for emotional distress while permitting a slander claim because slander does not require proof of mental or physical injury).

¶ 20 Furthermore, the exclusive remedy provision extends far enough to bar what are essentially tort claims masquerading as breach of contract claims. *See* 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 100.03[9], at 100–19 to 21 (2000) ("The all-inclusive character of the exclusiveness principle results in barring actions for covered injuries even though the plaintiff casts his or her action in the form of a breach of some kind of contract."); *see also Hurd v. Monsanto Co.*, 908 F.Supp. 604, 611 (S.D.Ind.1995); *Beauchamp v. Dow Chem. Co.*, 427 Mich. 1, 398 N.W.2d 882, 894 (1986), *superseded in other respects by statute as stated in Shipman v. Fontaine Truck Equip. Co.*, 184 Mich.App. 706, 459 N.W.2d 30, 34 (1990); *Hornsby v. Southland Corp.*, 487 A.2d 1069, 1071–72 (R.I.1985). Under such circumstances, the *Mounteer* analysis cited above still applies to prevent employees from evading the recovery restrictions of the Act.

¶ 21 However, a claim for contractual relief seeking benefits in addition to the workers' compensation system is not barred by the exclusivity provision. Indeed, while the Act expressly prohibits contracts that would limit an employee's right to workers' compensation, *see* Utah Code Ann. § 34A–2–108 (1997), nothing prohibits an employer from agreeing to provide benefits in addition to those provided in the Act. *See Fredericks v. Liberty Mut. Ins. Co.*, 255 Ill.App.3d 1029, 194 Ill.Dec. 445, 627 N.E.2d 782, 786 (1994); *Decatur County v. Public Employment Relations Bd.*, 564 N.W.2d 394, 398 (Iowa 1997); *Segura v. Molycorp, Inc.*, 97 N.M. 13, 636 P.2d 284, 287–89 (1981); *Hornsby*, 487 A.2d at 1072. Under the subsection entitled "Legal Status of Contractual Supplement to [Workers'] Compensation," Larson's workers' compensation treatise states as follows:

It is possible to imagine a number of troublesome legal questions that might emerge from the type of contract in which the employer agrees to pay, say, $250 a week benefits instead of the $200 specified by statute. One cardinal principle, however, should ordinarily settle most such questions. That principle is the simple proposition that the contractual excess is not workers' compensation. It performs the same functions, and is payable under the same general conditions, but legally it is nothing more than the fruit of a private agreement to pay a sum of money on specified conditions. The provisions of a compensation act may be incorporated into the agreement by reference, but the operative force and the ultimate legal character of the arrangement remain that of private contract.

9 Larson & Larson, *supra*, § 157.05[3], at 157–46.

¶ 22 In short, employment agreements expressly promising benefits in addition to those already mandated by the Act should be enforced according to normal contract law principles. *See, e.g., Stoecker v. Brush Wellman, Inc.*, 194 Ariz. 448, 984 P.2d 534, 538–39 (1999); *Larke v. City of Fort Lauderdale*, 568 So.2d 58, 59 (Fla.Dist.Ct. App.1990); *Board of Educ. v. Chicago Teachers Union*, 86 Ill.2d 469, 56 Ill.Dec. 653, 427 N.E.2d 1199, 1201 (1981). Thus, if Snowbird contracted to pay benefits in addition to those provided by the workers' compensation system, that contract potentially furnishes the basis for a legitimate claim.

¶ 23 This conclusion is supported by sound policy considerations. As already noted, workers' compensation is a quid pro quo, both granting and withdrawing specified employee and employer rights. *See Hunsaker*, 870 P.2d at 899. For its part of this bargain, an employer obtains valuable protection from tort suits. *See id.* The workers' compensation system, however, "was not designed or intended to free an employer from performing its contractual promises to provide specific benefits to its employees." *Stoecker*, 984 P.2d at 538. Extending the Act's coverage to that extent would undermine the balance of rights embodied in the Act.[3] We therefore

3. Moreover, although we see no evidence of dis-

ingenuous motives in the instant case, interpret-

reverse the trial court's holding that the Workers' Compensation exclusive remedy provision necessarily bars Shattuck–Owen's contract claim and remand for application of the standard set forth in this opinion.[4]

## CONCLUSION

¶ 24 We affirm the trial court in part and reverse it in part. The trial court correctly ruled that Shattuck–Owen had not offered any facts demonstrating Snowbird publicly disclosed private facts sufficient to support a cause of action for invasion of privacy. The trial court erred, however, in ruling as a matter of law that Roberts lacked authority to contract on behalf of Snowbird and in ruling that Shattuck–Owen's breach of contract claim was necessarily barred by the exclusive remedy provision of the Workers' Compensation Act. We reverse the trial court's entry of summary judgment on that claim and remand the case for further proceedings consistent with this opinion.

¶ 25 Chief Justice HOWE, Associate Chief Justice RUSSON, Justice DURHAM, and Justice WILKINS concur in Justice DURRANT'S opinion.

ing the exclusivity provision to void all contracts for benefits of the type also provided by workers' compensation would allow unscrupulous employers to take advantage of unsophisticated workers by promising benefits that the employers have no intention of delivering. *See Stoecker,* 984 P.2d at 538–39.

4. Snowbird also argues that the alleged contract lacked sufficient definiteness to be enforced. Because the trial court rested its decision on other grounds, it did not reach this issue. We believe the trial court is in a better position to first apply the directives of this opinion, and then address any further potential issues if and when they arise. We therefore decline to address the issue at this time.