**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

E.SPIRE COMMUNICATIONS, INC.;
ACSI LOCAL SWITCHED
SERVICES, INC., doing business as
e.spire Communications,

      Plaintiff - Appellant,

v.

NEW MEXICO PUBLIC
REGULATION COMMISSION;
LYNDA LOVEJOY; DAVID W.
KING; HERB H. HUGHES; JEROME
D. BLOCK; E. SHIRLEY BACA,
Commissioners of the New Mexico
Public Regulation Commission;
QWEST CORPORATION,

      Defendants - Appellees.

No. 03-2161

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CIV-02-495-LCS/RLP)**

---

David M. Kaufman of David M. Kaufman P.C., Santa Fe, New Mexico, for
Plaintiff-Appellant.

Margaret Caffey-Moquin, Associate General Counsel (James C. Martin, General
Counsel, with her on the brief), Santa Fe, New Mexico, for Defendant-Appellee
New Mexico Public Regulation Commission and its Commissioners.

Mary Rose Hughes of Perkins Coie LLP, Washington, D.C. (Stephen S. Hamilton
of Montgomery & Andrews, P.A., Santa Fe, New Mexico, with her on the brief),
for Defendant-Appellee Qwest Corporation.

Before **HARTZ, McKAY,** and **O'BRIEN,** Circuit Judges.

**McKAY**, Circuit Judge.

This case arose pursuant to the Telecommunications Act of 1996 (the "Act"), codified at 47 U.S.C. § 151, *et seq*. The district court's opinion provides a good history of the telecommunications industry and a detailed description of the instant dispute which will not be repeated at length here. The relevant facts are as follows.

In 1996, Appellant e.spire Communications, Inc.'s predecessor, American Communications Services, Inc., ("ACSI"), requested interconnection, service, and unbundled network elements from U.S. West, Appellee Qwest's predecessor. When the parties were unable to negotiate all of the terms of the Interconnection Agreement ("IA"), ACSI petitioned the New Mexico State Corporation Commission ("NMSCC"), Appellee New Mexico Public Regulation Commission's ("NMPRC") predecessor, to arbitrate the unresolved issues.

On December 6, 1996, NMSCC issued its findings of fact and conclusions of law on the arbitration. At paragraph 80, NMSCC stated that "[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket." Aplt. App., Vol. III, at C43.

On March 3, 1997, NMSCC issued an order resolving a motion for clarification filed by the parties and ordered the parties to prepare and file an IA consistent with the Arbitration Order. ACSI and U.S. West filed the IA on March 10, 1997, which NMSCC approved on April 9, 1997. The IA set the call termination rate at .0029585 per Minute of Use ("MOU") for large metropolitan areas but did not specifically state whether the rate was permanent or interim.

On March 17, 1998, ACSI filed a complaint with NMPRC, f/k/a NMSCC, alleging that U.S. West had failed to pay reciprocal compensation to ACSI for terminated calls to Internet Service Providers ("ISPs") pursuant to the IA at the IA approved rate of .0029585 per MOU. U.S. West asserted that it was not obligated to pay reciprocal compensation and, in the alternative, that, if it was so obligated, any payment should be at the rate established by NMPRC in its Cost Docket Order[1] (.0011083 per MOU) because the IA rates were interim. NMPRC agreed with ACSI that reciprocal compensation was required but stated that the rates in the IA were interim. Since the Cost Docket rate was established in August 1998, NMPRC decided that the lower rate established in the Cost Docket

---

[1]The Cost Docket Order noted that in a number of arbitrations, including the U.S. West/ACSI arbitration, the Commission had "established interim prices for interconnection, unbundled network elements, transport and termination." Aplt. App., Vol. III, at C93. It then stated that it was establishing "permanent prices for interconnection, unbundled network elements, and transport and termination." Id. at C93-94.

Order applied to minutes terminated during and after September 1998. The Final Order was entered on March 5, 2002.

e.spire, f/k/a ACSI, filed the current complaint in the district court on May 2, 2002, seeking review of NMPRC's Final Order pursuant to 47 U.S.C. § 252(e)(6) and 28 U.S.C. § 1331. e.spire alleged that NMPRC violated the Act by failing to enforce the unambiguous language of the IA which allegedly set permanent rates for call termination. e.spire further claimed that its equal protection and due process rights were violated and that its property had been taken without payment of just compensation. e.spire also asserted a claim for damages against NMPRC pursuant to 42 U.S.C. § 1983 for deprivation of "rights, privileges and immunities secured to it under the Due Process Clause and the Equal Protection Clause of the United States Constitution." Aplt. App., Vol. I, at A66.

The district court agreed with NMPRC and Qwest, f/k/a U.S. West, and affirmed NMPRC's Final Order in the underlying administrative complaint proceeding. The district court also granted partial summary judgment dismissing e.spire's causes of action for deprivation of due process, equal protection, unlawful taking, and damages pursuant to 42 U.S.C. § 1983. e.spire appeals to this court.

The issues on appeal are 1) whether the district court correctly decided that

NMPRC was not arbitrary and capricious in exercising its continuing jurisdiction to interpret and enforce the IA between e.spire and Qwest; 2) whether the district court was correct in granting summary judgment to Appellees on e.spire's constitutional and 42 U.S.C. § 1983 claims; and 3) whether the district court was correct in denying e.spire's request for leave to amend its amended complaint to include a claim for impairment of contract.

We review *de novo* the district court's grant of summary judgment applying the same legal standards as the district court. Ahrens v. Ford Motor Co., 340 F.3d 1142, 1145 (10th Cir. 2003); Steele v. Thiokol Corp., 241 F.3d 1248, 1252 (10th Cir. 2001). We review *de novo* whether the state commission properly interpreted and applied the Act and its regulations. Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 717 (10th Cir. 2002). Once we determine that the state commission properly interpreted the Act and its regulations, we apply an arbitrary and capricious standard to review the commission's application of that law to the facts of the case. Id.

The parties agree that they are bound by a partially negotiated, partially arbitrated IA. The crux of the dispute is whether a specific term–the call termination rate for calls to ISPs–was arbitrated or negotiated. e.spire contends that the rate was negotiated while Appellees argue that the rate was arbitrated. e.spire further argues that NMPRC incorrectly interpreted the IA and decided that

the (allegedly negotiated) call termination rate set forth therein was interim instead of permanent. Because this query involves determinations of fact and because there is no meritorious argument that NMPRC incorrectly interpreted and applied the Act itself, we apply an arbitrary and capricious standard of review. See id. Therefore, the specific question on appeal is whether NMPRC was arbitrary and capricious in its factual findings and resultant interpretation of the IA. Based on this deferential standard of review and the record on appeal, we hold that NMPRC was not arbitrary and capricious in its determination that the rate set forth in the IA was interim.

Section 252 of the Act expressly gives state commissions the authority to approve or reject interconnection agreements, but it does not specifically address the interpretation and enforcement of interconnection agreements after their initial approval. See 47 U.S.C. §§ 252(a)(2), (b)(1), (e)(1). However, "[t]his grant to the state commissions to approve or reject and mediate or arbitrate interconnection agreements necessarily implies the authority to interpret and enforce specific provisions contained in those agreements." Southwestern Bell Tel. Co. v. Brooks Fiber Communications of Okla., Inc., 235 F.3d 493, 497 (10th Cir. 2000); see also BellSouth Telecomm., Inc. v. MCIMetro Access Transmission Servs., Inc., 317 F.3d 1270, 1274 (11th Cir. 2003). The Act gives state commissions the power to arbitrate contested terms. Accordingly, NMPRC had

the inherent authority to interpret and enforce the IA that it had previously approved.

We agree with the district court that "[t]he Interconnection Agreement did not arise in a vacuum; it was but one step in a complex and on-going regulatory process." Aplt. App., Vol I., at A37 (E.spire v. Baca, 269 F. Supp. 2d. 1310, 1329 (D.N.M. 2003)). An interconnection agreement is not an ordinary private contract. It is a document resulting from arbitration authorized and required by federal law which cannot be viewed in isolation. An interconnection agreement is not to be construed as a traditional contract but as an instrument arising within the context of ongoing federal and state regulation. Verizon Maryland, Inc. v. RCN Telecom Servs., Inc., 232 F. Supp. 2d 539, 552 n.5 (D. Md. 2002) ("[A]n interconnection agreement is part and parcel of the federal regulatory scheme and bears no resemblance to an ordinary, run-of-the-mill private contract."). It is counterintuitive to require a state commission to interpret such a document without the benefit of the circumstances giving rise to the agreement.

e.spire asserts that NMPRC did not merely interpret the IA; instead, it modified the IA's terms. e.spire's argument is basically that NMPRC ignored the plain unambiguous language of the IA and improperly modified the IA to reflect its interpretation of extrinsic evidence. This attempt by e.spire to characterize NMPRC's ruling as a modification of the IA instead of an interpretation is

mistaken.  NMPRC did not attempt to modify the IA.  Instead, NMPRC construed the IA as consistent with its own Arbitration Order which specified the terms which were arbitrated.  NMPRC gave effect to all of the IA's terms within the intent of all of NMPRC's prior orders.  The prior orders are part and parcel of the IA, and the IA cannot be severed from the circumstances that gave rise to it.

The IA, the Arbitration Order, and the other documents that were before NMPRC involving the ISP call termination rate are not a model of clarity. NMPRC, acting in its unique area of expertise, sifted through these documents and other evidence and made a determination that the IA call termination rate for ISPs was 1) arbitrated, not negotiated, and 2) intended to be interim in effect until the Cost Docket rate was established.  At the heart of these determinations were a string of factual findings in support of this conclusion.

NMPRC first found that e.spire had brought the rate-setting issue before the NMPRC for arbitration which NMPRC resolved by arbitration.  Aplt. App., Vol. III, at 158-59, 187; Aplt. App., Vol. I., at A36 (E.spire v. Baca, 269 F. Supp. 2d. 1310, 1328 (D.N.M. 2003) ("A *de novo* review of the record and actions of the NMPRC establishes that e.spire brought the rate-setting issue before the NMPRC for arbitration and that the NMPRC resolved this issue by arbitration.")).  In support of this factual finding, NMPRC noted that e.spire's Petition for Arbitration showed that it asked for the arbitration of "issues concerning

compensation for the transport and termination of traffic exchanged between the parties." Aplt. App., Vol. IV, at D84-85, 87. The Hearing Examiner noted that e.spire's post- (arbitration) hearing brief "made it clear that the Commission needed to conduct an investigation into cost/price issues, and that there was no prior negotiated agreement on a specific termination rate." Aplt. App., Vol. III, at 187-88. The above record support belies e.spire's argument that the rates were negotiated and set before arbitration commenced.

NMPRC's second finding was that the IA call termination rate for ISPs was intended to be interim and only in effect until the Cost Docket rate was established. In support of this finding, NMPRC noted that the Arbitration Order directed the parties to set interim rates and told them how to calculate the rates. Aplt. App., Vol. III, at C50; Vol. I, at A308-11. It noted that, at paragraph 80, NMSCC had stated that "[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket." Aplt. App., Vol. III, at C43. The Arbitration Order reserved certain issues, including the establishment of permanent prices, for resolution in the Cost Docket proceeding. See id. The Cost Docket Order further noted that in a number of arbitrations, including the U.S. West/ACSI arbitration, the Commission had "established interim prices for interconnection, unbundled network elements, transport and termination." Aplt. App., Vol. III, at C93-94. It then stated that it

was establishing "permanent prices for interconnection, unbundled network elements, and transport and termination." Id. at C94. Relying on the above record support, NMPRC was not clearly erroneous in construing the IA to include the costing docket studies referred to in the Arbitration Order.

e.spire tries to hang its argument on the absence of a footnote in the IA. Specifically, there is a footnote in the IA which states that the rates for unbundled loops are interim, but no similar footnote appears on the call termination rate page. However, NMPRC determined that its placement of Finding 80 at the end of Section B ("[t]he prices established in this arbitration are interim prices and will be in effect pending completion of the Commission's costing docket") was not intended to limit its effect to unbundled loop rates. Aplt. App., Vol. III, at C43, C159. An additional footnote would have made the IA *more* clear. But, the absence of a footnote does not automatically render it unclear. We are reluctant to hold that the absence of a footnote renders all of the other record evidence meaningless. The absence of a footnote cannot control prior relevant language in the agreement. The Arbitration Order expressly set aside pricing elements in the IA as being interim and subject to the costing docket. Since by its express terms the Arbitration Order applies to all prices established in the arbitration, call termination rates must be similarly treated.

NMPRC was authorized to establish prices for call termination and to make

those rates interim. The IA's silence on whether the specific rates were interim or permanent should not be construed contrary to the intent of NMPRC. Although the IA does not specify within its four corners that the call termination rates are interim, it also does not expressly state that they are permanent. It would be inconsistent with the IA and the circumstances leading up to the agreement to hold that NMPRC could not construe the IA in a manner consistent with its own intent because of the lack of a clarifying footnote in the IA itself.

We hold that the rates for call termination were established in the arbitration and that NMPRC's determination that those rates were interim was not arbitrary and capricious. We are in no way implying that parties cannot negotiate agreements. We simply hold that the call termination rate for ISPs in this particular case was arbitrated, not negotiated.

The district court did not err in its grant of summary judgment to Appellees on e.spire's constitutional and 42 U.S.C. § 1983 claims. e.spire first argues that "[t]he imposition of the costing docket rate . . . was arbitrary and capricious discrimination without rational justification in violation of e.spire's rights to equal protection and substantive due process under the United States and New Mexico Constitutions." Aplt. App., Vol. I, at A17. The Equal Protection Clause provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws. U.S. Const. amend. XIV, § 1. The New Mexico

Constitution also provides that no "person [shall] be denied equal protection of the laws." N.M. Const. art. II, § 18. Equal protection of the laws "is essentially a direction that all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985). Since e.spire does not assert that it is a member of a suspect class or was denied a fundamental right, the state regulation need only be rationally related to a legitimate government purpose. Save Palisade Fruit Lands v. Todd, 279 F.3d 1204, 1213 (10th Cir. 2002). Therefore, NMPRC's imposition of the costing docket rate "need only bear a rational relation to some legitimate end to satisfy the Equal Protection Clause." Id. at 1213 (quoting Kinnel v. Graves, 265 F.3d 1125, 1128 (10th Cir. 2001) (internal quotations omitted)).

The imposition of the costing docket rate was rationally related to a legitimate end. The Act requires that state commissions set just and reasonable rates that are non-discriminatory and cost-based. See 47 U.S.C. § 252(d). e.spire has failed to demonstrate that the imposition of the costing docket rate was discriminatory. The rates set were applied across the board to all of the interconnection agreements which had been arbitrated prior to the Cost Docket Order. Aplt. App., Vol. III, at C93-94, ¶¶ 13-14. Additionally, the rates were based on forward-looking cost studies in which e.spire participated. Id. at C23 ¶ 21; Vol. I, at A28. We agree with the district court that "[t]he imposition of the

-12-

rate set by the Costing Docket was rationally related to the legitimate state interests in setting just and reasonable rates and ensuring greater competition in the local telephone services market." Aplt. App., Vol. I, at A28.

The district court also did not err in its determination that e.spire's substantive due process rights were not violated. "The Fourteenth Amendment proscribes a state from, among other things, depriving a party of 'property without due process of law.'" Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000) (quoting U.S. Const. amend. XIV, § 1). The New Mexico Constitution similarly provides that "[n]o person shall be deprived of life, liberty, or property without due process of law." N.M. Const. art. II, § 18. "Property," as it relates to the Due Process Clause, is a "legitimate claim of entitlement" to some benefit. Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). A unilateral expectation that the rate stated in the IA was permanent does not constitute a protectable property right. See Hyde Park, 226 F.3d at1210 ("An abstract need for, or unilateral expectation of, a benefit does not constitute 'property.'"). e.spire did not establish a protectable property interest and therefore cannot survive rational basis review. See id.

Additionally, e.spire's assertion that its due process rights were violated when NMPRC refused to enforce the terms of the IA is not supported by the facts. As discussed above, NMPRC did enforce the terms of the IA. It determined that

-13-

the rate stated in the IA was interim, only in effect until the permanent cost docketing rate was established. The replacement of the interim rate with the permanent rate did not change the terms of the IA.

e.spire's assertion of an unconstitutional taking of property without just compensation in violation of the Fifth and Fourteenth Amendments and New Mexico Constitution art. II, §§ 18 and 20[2] must similarly fail. In order to prevail on a takings claim, e.spire must establish 1) that it had a protectable property interest and 2) that the governmental action is a taking without just compensation. Puerto Rico Tel. Co. v. Telecomm. Regulatory Bd. of Puerto Rico, 189 F.3d 1, 16 (1st Cir. 1999). e.spire cannot meet the first requirement thus rendering the second element moot. A unilateral expectation that the rate stated in the IA was permanent does not constitute a protectable property right. e.spire voluntarily submitted the issue of the call termination rate to be determined by NMPRC in binding arbitration. See Connolly v. Pension Benefit Guarantee Corp., 475 U.S. 211, 227 (1986). Additionally, as discussed above, the ISP call termination rate that e.spire relied on was interim, not permanent. e.spire could not have had a protectable property interest in the interim call termination rate remaining permanent. "e.spire does not have a property right in [the] application of the

---

[2]"Private property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20.

interim rate for an indefinite period, [and therefore] it cannot assert a viable takings claim under the Fifth Amendment." Aplt. App., Vol. I, at A30-31 (E.spire v. Baca, 269 F. Supp. 2d. 1310, 1325 (D.N.M. 2003)).

We need not address whether e.spire is entitled to bring a 42 U.S.C. § 1983 claim for damages based on deprivations under the Act because, as discussed above, none of e.spire's Constitutional claims are viable in this case. Since e.spire has failed to establish the violation of a federally protected right, the § 1983 cause of action must fail. See Crown Point I, LLC v. Intermountain Rural Elec. Ass'n, 319 F.3d 1211, 1216 (10th Cir. 2003) ("In order to prevail on its 42 U.S.C. § 1983 claim, plaintiff must demonstrate that it suffered a deprivation of a federally protected right.").

The district court did not abuse its discretion in denying e.spire's request for leave to amend its amended complaint to include a claim for impairment of contract. "A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment." Bauchman for Bauchman v. West High Sch., 132 F.3d 542, 562 (10th Cir. 1997); see also Wilson v. American Trans Air, Inc., 874 F.2d 386, 392 (7th Cir. 1989).

We agree with the district court that "NMPRC's modification of the call

termination rate was consistent with the Interconnection Agreement and authorized by law." Aplt. App., Vol I., at A38 (<u>E.spire v. Baca</u>, 269 F. Supp. 2d. 1310, 1329 (D.N.M. 2003). Therefore, an impairment of contract claim would not survive a motion to dismiss or for summary judgment.

**AFFIRMED**.